COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-250-CV

 

 

IN THE
INTEREST OF T.D.L., T.L.C., T.D.L., AND Z.D.L., CHILDREN

 

                                                                                                        

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1] 

 

                                              ------------

I. Introduction

Appellant Wytasha appeals the trial court=s order
terminating her parental rights to four of her children.[2]  In six points, Wytasha complains that the
evidence is legally and factually insufficient to support the trial court=s
finding that termination was in the children=s best
interest or either statutory ground for termination found by the trial
court.  We will affirm.  








II.  Factual and Procedural Background

Wytasha is the mother of five children:  T.D.L., born May 17, 1996; T.L.C., born May
2, 1997; T.D.L. (hereinafter referred to as T.L. for clarity), born January 3,
1999; Z.D.L., born November 22, 2002; and S.E.H., born January 25, 2004.[3]  

In September 2001, after Wytasha=s first
three children were born, Child Protective Services (CPS) received its first
referral concerning Wytasha.  The
referral alleged neglectful supervision of the three children because Wytasha
was taking prescriptions drugs, making her unable to parent her children.  After an investigation, CPS Aruled
out abuse at that time.@   








In November 2002, while Wytasha was pregnant with
her fourth child, Z.D.L., CPS received its second referral, alleging that
Wytasha used the prescription drug Xanax while pregnant with Z.D.L.  On November 22, 2002, Z.D.L. was born and
tested positive for Xanax.  During an
investigation into this referral, CPS investigator Tracie Harper discovered
that Wytasha=s older children were not in
school.  Harper called Wytasha on
December 9, 2002, informed her of the allegation against her, and scheduled a
home visit for the following day.  When
Harper went to Wytasha=s home the next day, T.L., who
was almost three years old at the time, answered the door.  Wytasha was asleep on the couch, and Z.D.L.
was asleep in a baby carrier on the floor. 
T.L. unsuccessfully tried to wake his mother.  The phone rang several times, but it did not
wake Wytasha.  Harper also tried to wake
Wytasha, and after several attempts, she woke up.  Wytasha explained to Harper that a midwife
said it was okay to take Xanax while pregnant.[4]  When asked why her older children were not in
school, Wytasha explained that she had recently moved to an apartment that was
too far from the school, that she did not have transportation to take her
children to school, and that the school did not provide transportation.[5]  Wytasha said her mother Brenda planned to
move in with her and would provide transportation to take the children to
school.  Harper spoke with Brenda, who
confirmed the plan.[6]  Harper disposed of the November 2002 referral
with Areason to
believe@ there
was physical abuse of Z.D.L. because he tested positive for Xanax but Awith
factors controlled@ because Brenda planned to move
in with Wytasha.   













Almost six months later, in May 29, 2003, CPS
investigator Courtney Shallenberger received the third referral concerning
Wytasha.  A Department of Human Services
(DHS) employee made the referral alleging neglectful supervision after seeing
Wytasha lying on the DHS lobby floor holding six-month-old Z.D.L. in her
arms.  After a DHS employee took Z.D.L.
from Wytasha, she could not stand up. 
Shallenberger immediately went to the DHS office and talked to Wytasha;
Wytasha was slumped over, her eyes kept rolling back, and she was having a hard
time communicating.  Some of her
responses to Shallenberger=s
questions were appropriate, but some were not. 
Wytasha explained to Shallenberger that she took her prescription
medicationsCVicodin, Xanax, Prozac, and Asome
depression pills@Cwithout
eating that day.  Wytasha said Dr. Vasped
(phonetic) at the osteopathic hospital prescribed the drugs for her back pain,
anxiety, and depression and that she was going to stop taking them because they
affected her in a negative way.[7]  While at the DHS office, Wytasha signed a
safety plan stating that she would seek adult supervision for her children when
she was unable to properly supervise them and would not care for her children
when she was under the influence of prescription medications.[8]


On June 9, 2003, Shallenberger visited Wytasha=s home
and informed her of the severity of the allegations against her because it was
the third referral concerning Wytasha=s misuse
of prescription drugs.  Wytasha said she
had stopped taking her medications, and Shallenberger again urged Wytasha to
talk to her doctor before taking herself off her medications.  During this visit, Shallenberger had no
concerns about the condition of the home or the children=s
health, and the children told her they received plenty of food.   

On July 25, 2003, Shallenberger again visited
Wytasha at her home. Wytasha told Shallenberger that she had been taking her
medications as directed but that she had been out of them for one month.  Wytasha said four of her children had
received their shots but that Z.D.L. needed his six-month and seven-month
shots.  Three days later, Shallenberger
called Wytasha and asked if Wytasha had set up an appointment for Z.D.L.=s shots,
but Wytasha had not yet done so.  Wytasha
did say that she had an appointment in September with her doctor about her
prescription medications.    













On August 6, 2003, Shallenberger again called
Wytasha, who said Z.D.L. had received his shots.  The next day, Shallenberger visited Wytasha
at her home, and the two discussed Wytasha=s and
her children=s health. Shallenberger noticed
that Wytasha was coherent and that her speech was not slurred, unlike in
previous visits.  After several more
visits, Shallenberger closed the case with a finding of Areason
to believe for neglectful supervision@ because
Wytasha failed to take her medications properly, putting her children at risk.[9]
Shallenberger decided to leave the children with Wytasha because Wytasha=s mother
informed Shallenberger that she kept in daily contact with her daughter and
grandchildren and would help Wytasha with babysitting and transportation.       On March 30, 2004, two months after S.E.H.
was born, CPS received a priority one Aneglectful
supervision@ referral concerning
Wytasha.  The referral, made by S.E.H.=s
paternal grandmother Barbara, alleged that Wytasha had passed out, thereby
leaving the children without adult supervision, that there was no food in the
home, that the home and the children were filthy, and that roaches were
crawling all over the wall.  CPS
investigator Tammy Craddock visited Wytasha=s home
the following day.  Wytasha was not at
home, but S.E.H.=s father was there with the
children.  S.E.H. was dirty, was in a
diaper that looked like it had been wet for hours, and had formula caked under
his neck.  Craddock washed off the
formula, and it left red marks that looked raw and sore.  The home was filthy and roaches were
everywhere.  The children slept on
mattresses scattered all over the floor without sheets.  The refrigerator contained rotting food, but
there was enough food in the freezer and enough dry goods to feed the children
for a few days.  Wytasha called home
during Craddock=s visit and told Craddock that
she was taking Vicodin, Prozac, Xanax, and Soma.  She also explained that she ran out of food
stamps in the middle of the month. 
Wytasha=s speech was slurred, and she
could not understand everything Craddock told her.  Wytasha and Craddock agreed to a safety plan,
which included Barbara taking S.E.H. until Wytasha could clean the house and get
food in the home and required Wytasha to take a drug test and to refrain from
acting as the primary caregiver for the other four children while she was
taking medications.  The following day,
Wytasha took a drug test and tested positive for marijuana and
benzodiazepines.  Wytasha testified at
trial that she got her prescription medications from Aa friend
that knows people.@    








Craddock returned to Wytasha=s home
on April 22, 2003, but no one was home. 
While Craddock waited outside, Wytasha, the four older children, and two
men arrived in a vehicle.  One of the men
was drinking a beer, and Craddock observed him get out of the car and urinate
on the wheel.  Wytasha appeared drunk;
she had difficulty walking, used the wall for stability, and slurred her
speech.  Wytasha told Craddock that she
was tired but that she had not been drinking. 
Wytasha=s home was dirty, there was no
food in the home, and the electricity had been shut off.  However, the mattresses were now on frames
that Barbara had purchased.  Wytasha
explained that she kept food at a friend=s house,
where she would prepare it and then bring it back to her house.  Wytasha had not been to a doctor to evaluate
her medications. Craddock and her supervisor decided to leave the children with
Wytasha for the night,[10]
but the next day, Craddock returned to Wytasha=s house
and took the children to Barbara=s
home.  Craddock explained to Wytasha that
the children would remain with Barbara until Wytasha could clean the home and
supply it with food and electricity, take another drug test, and set up a
doctor=s
appointment to get proper medications. 
CPS then referred the case to Family-Based Safety Services (FBSS).    








FBSS developed a service plan for Wytasha that
included drug treatment. At some point, the children returned to live with
Wytasha.  On June 11, 2004, Barbara went
to Wytasha=s house to check on the children
and found Brenda, who had been babysitting the children that day, passed out on
the couch and S.E.H. in a car seat spitting up formula.  An FBSS worker visited Wytasha the next day,
and Wytasha agreed to voluntarily place all five children with Barbara. Wytasha
and Brenda took drug tests, and both tested positive for prescription
medication.  Wytasha also tested positive
for cocaine.   

Wytasha agreed to continue the service plan, but
she did not set up a drug assessment and only attended a few of the classes
FBSS set up for her.[11]
Wytasha claimed that she lived too far from the bus line and did not have any
other means of transportation to get to the classes.  FBSS offered to arrange transportation for
her as long as she called twenty-four hours ahead of time, and Wytasha later
used FBSS to get to some ROADS classes. 
Wytasha took two more drug tests and tested positive for prescription
medications, but she told an FBSS worker that she was not seeing a doctor or on
prescription medications at that time. 
Wytasha admitted that she got her medications from a friend. 








The children remained with Barbara until August
2004, and at that point, Barbara told FBSS that she could not financially
support all of the children.  S.E.H.
stayed with Barbara, but FBSS placed the four older children in foster
care.  Wytasha had not made any progress
on her drug treatment, and FBSS did not believe Brenda could provide a healthy
environment based on the recent babysitting incident and her positive drug
test.    

CPS caseworker Marwa Tarabishi took over the case
when CPS placed the children in foster care. 
Tarabishi and Wytasha developed a service plan in which Wytasha would
participate in counseling, psychological testing, a drug assessment, and random
drug testing.  Tarabishi gave Wytasha the
information she needed to set up a drug assessment, but Wytasha never set up an
appointment.  Wytasha claimed she did not
have transportation to take her to the assessment, but after CPS offered to
help with transportation and gave her a bus pass, Wytasha still failed to set
up a drug assessment.     








Tarabishi set up a psychological evaluation and
provided Wytasha with transportation for the first half of the evaluation, but
Wytasha failed to attend the second half, even though she had a bus pass.  Wytasha, who allegedly has sickle cell
anemia, claimed the bus stop was too far from her home.[12]  Tarabishi asked Wytasha to provide a doctor=s note
stating that she could not walk, but Wytasha failed to do so.  Wytasha never attended any counseling.  Tarabishi asked Wytasha to take a random drug
test on three occasions, but Wytasha never took them, again claiming she did
not have transportation.  Tarabishi also
set up weekly visits between Wytasha and her children, and over the course of
nine months, Wytasha attended fifteen of thirty-two offered visits.  On several occasions, the foster parents
brought the children to the CPS office for a scheduled visit, but Wytasha did
not show up, which greatly disappointed the children.  During the entire time that CPS was involved
with Wytasha, she never had a job, although she applied for a few jobs.    

Brenda requested that the children be permitted
to live with her, but after conducting a home study on Brenda, CPS determined
that she was not a possible placement option. 
CPS knew of no other relatives who could serve as a placement
option.   








At the time of trial, T.D.L. was doing well in
his foster home.  T.L.C., who has had
medical and behavioral problems in foster care, was in her third foster
home.  T.L., who has had a few behavioral
problems since he went to foster care, was doing much better, and Z.D.L. was
doing great.  Three months before trial,
Wytasha got engaged to Stanley Taylor and is currently living with him and his
nine-year-old child in Taylor=s
three-bedroom home.  Wytasha testified at
trial that she quit taking medications three months before trial but that she
has not seen a doctor since she had her last child, S.E.H.  Wytasha testified that she had recently
applied for Medicaid.    

On June 23, 2005, after hearing testimony from
both sides, the trial court found that Wytasha=s
parental rights to T.D.L., T.L.C., T.L., and Z.D.L. should be terminated
because she had violated subsections 161.001(1)(D) and (E) of the Texas Family
Code and because termination was in the best interest of the four
children.  Accordingly, the trial court
entered an order terminating Wytasha=s
parental rights.  This appeal followed.

III.  Standard of Review








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the State must
establish one or more of the acts or omissions enumerated under subdivision (1)
of the statute and must also prove that termination is in the best interest of
the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2005); Richardson v. Green, 677 S.W.2d 497, 499
(Tex. 1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.CWaco
2002, pet. denied).  Both elements must
be established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. 
Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).  Because of the elevated status of
parental rights, the quantum of proof required in a termination proceeding is
elevated from the preponderance of the evidence to clear and convincing
evidence.  Santosky v. Kramer, 455
U.S. 745, 758‑59, 102 S. Ct. 1388, 1397 (1982); see also Tex. Fam. Code Ann. '
161.001.

The higher burden of proof in termination cases
alters the appellate standard for both legal and factual sufficiency
reviews.  In re J.F.C., 96 S.W.3d
256, 265 (Tex. 2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); In re
J.T.G., 121 S.W.3d 117, 124 (Tex. App.CFort
Worth 2003, no pet.).  Both legal and
factual sufficiency reviews in termination cases must take into consideration
whether the evidence is such that a fact finder could reasonably form a firm
belief or conviction about the truth of the matter on which the State bears the
burden of proof.  J.F.C., 96
S.W.3d at 265‑66; C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d
at 124.  








Accordingly, in reviewing the evidence for legal
sufficiency in parental termination cases, we Alook at
all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or conviction
that its finding was true.@  J.F.C., 96 S.W.3d at 266.  In conducting our review, we must disregard
all evidence that a reasonable trier of fact could have disbelieved; however,
we must consider undisputed evidence even if it does not support the
finding.  Id.  If, after conducting our review, we determine
that no reasonable trier of fact could have formed a firm belief or conviction
that its finding was true, then we must conclude that the evidence is legally
insufficient.  Id. 

In determining a factual sufficiency point, we
must give due consideration to evidence that the trier of fact could reasonably
have found to be clear and convincing and then determine whether, based on the
entire record, a fact finder could reasonably form a firm conviction or belief
that the parent violated one of the provisions of section 161.001 and that the
termination of his or her parental rights would be in the child=s best
interest.  Tex. Fam. Code Ann. '
161.001; C.H., 89 S.W.3d at 25. 
In reviewing the factual sufficiency of the evidence, we must consider
all the evidence in the record, both that in support of and contrary to the
trial court=s findings.  C.H., 89 S.W.3d at 27‑29.
Additionally, we must consider whether disputed evidence is such that a
reasonable trier of fact could not have reconciled that disputed evidence in
favor of its finding.  J.F.C., 96 S.W.3d
at 266.  If the disputed evidence is of
such magnitude that a trier of fact could not reasonably have formed a firm
belief or conviction that its finding was true, then the evidence is factually
insufficient.  Id. 

IV.  Endangerment Finding








In her third through sixth points, Wytasha argues
that there was insufficient evidence to support the trial court=s
finding that she had in any way endangered her four children.  TDFPS argues that there is ample evidence to
support the trial court=s findings that Wytasha violated
family code subsections 161.001(1)(D) and (E). 








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; J.T.G., 121 S.W.3d at 125; see also In re M.C., 917
S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), TDFPS had to prove that Wytasha (1)
knowingly (2) placed or allowed T.D.L., T.L.C., T.L., and Z.D.L. to remain (3)
in conditions or surroundings that endangered their physical or emotional well‑being.  See Tex.
Fam. Code Ann. ' 161.001(1)(D).  Under section 161.001(1)(E), the relevant
inquiry is whether evidence exists that the endangerment of the children=s
physical well‑being was the direct result of the parent=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. '
161.001(1)(E). Additionally, termination under section 161.001(1)(E) must be
based on more than a single act or omission; a voluntary, deliberate, and
conscious course of conduct by the parent is required.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. '
161.001(1)(E).  However, it is not
necessary that the parent=s conduct be directed at the
children or that the children actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct both
before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).   

Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A fact‑finder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 256, and C.H., 89
S.W.3d at 17.  Drug use and its effect on
a parent=s life and
her ability to parent may establish an endangering course of conduct.  Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).  Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  J.T.G.,
121 S.W.3d at 126.  The record contains
the following evidence of subsection (D) environmental endangerment and subsection
(E) course of conduct endangerment to the physical or emotional well‑being
of the children.








The record demonstrates that Wytasha continuously
abused prescription drugs, even during pregnancy with her youngest child,
S.E.H.  The evidence demonstrates that
Wytasha also tested positive for marijuana and cocaine on two prior
occasions.  CPS and FBSS received a total
of four referrals regarding WytashaCthree of
which dealt with Wytasha=s prescription drug use.[13]  The CPS investigator urged Wytasha to see a
doctor regarding her prescription drug use, but Wytasha continuously failed to
do so.  She continued to test positive
for drugs although at times she was not seeing a doctor, and she later admitted
that she got the drugs from a friend.   








Wytasha contends that the record fails to show
any actual injury to the children=s
physical or emotional well-being. 
Subsections 161.001(1)(D) and (E) only require endangerment to the
children=s
physical and emotional well-being, which may be inferred from Wytasha=s
misconduct standing alone.  See Tex. Fam. Code Ann. '
161.001(1)(D), (E); Boyd, 727 S.W.2d at 533; R.W., 129 S.W.3d at
738.  Additionally, the record shows CPS
and FBSS investigators= repeated concerns regarding the
children=s
physical and emotional well-being.  A CPS
investigator once found Wytasha passed out on the couch with the children at
home, and another time, she was found sprawled on the DHS lobby floor with her
six-month-old baby in hand.  CPS
investigator Craddock testified that during one visit to Wytasha=s home,
there was very little food, the house was filthy, roaches were everywhere, and
baby S.E.H. was dirty and had formula caked on his neck.  Craddock testified that she returned the next
month and found that the home was still dirty, there was still no food in the
home, and the electricity had been shut off. 
Wytasha=s prior course of conduct
regarding her misuse of prescription drugs demonstrated that she endangered her
children=s
well-being and that she failed to demonstrate appropriate parenting skills.

Additionally, Wytasha=s course
of conduct after CPS informally removed her children from her care shows that
she took little or no action to correct these problems.  After FBSS placed the children with Barbara,
Wytasha took and failed three drug tests, repeatedly testing positive for
prescription medications.  Even though
Wytasha said she had no problem with the safety plan set up by FBSS, she failed
to set an appointment for a drug assessment, failed to attend any drug
treatment classes, and attended only a few ROADS classes.   








After FBSS placed the children in foster care and
CPS took over the case, Wytasha failed to participate in the new service plan
set up by the CPS investigator.  Wytasha
failed to set an appointment for a drug assessment, failed to finish her
psychological evaluation, and failed to attend any counseling or take any drug
tests set up by CPS.  Wytasha attended
less than half of the thirty-two scheduled visits with her children.  Wytasha alleged that she could not carry out
the service plan or attend the visits because she lacked transportation.  But both FBSS and CPS offered transportation,
and CPS ultimately gave her a bus pass.  

Despite Wytasha=s
contention that she stopped using drugs three months prior to trial, the trial
court was not required to ignore her history of prescription drug misuse merely
because it allegedly abated before trial. 
See R.W., 129 S.W.3d at 741. 
Moreover, Wytasha=s testimony at trial shows that
she failed to realize the severity of the situation and that although she
planned to take action, she had not done so. 
Wytasha testified that she had not been to a doctor since she had her
last child, S.E.H.  She testified, 

And I want to get myself
together. . . .  I really want to do
right.  I want to start going back to the
classes and I want my children back.  And
it -- it has been hitting me now. 
Because nine months ago when this first happened, I didn=t really think it was
going to get like this, and now I see that I=m -- I=m about to lose my children.

 

Therefore, even if the trial court believed that Wytasha had stopped
misusing prescription drugs prior to trial, the court could infer that Wytasha=s
prescription drug misuse would likely recur and further jeopardize her children=s
well-being.  See id. 








We have carefully reviewed the entire
record.  Looking at the evidence in the
light most favorable to the trial court=s
finding, giving due consideration to evidence that the fact finder could
reasonably have found to be clear and convincing, we hold that a reasonable
trier of fact could have formed a firm belief or conviction that Wytasha
knowingly placed T.D.L., T.L.C., T.L., and Z.D.L. in conditions and engaged in
conduct that endangered the children=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. '
161.001(1)(D), (E); J.F.C., 96 S.W.3d at 265‑66; C.H., 89
S.W.3d at 25; J.T.G., 121 S.W.3d at 124. 
Accordingly, we hold that the evidence is legally and factually
sufficient to support the trial court=s
finding on endangerment.  We overrule
Wytasha=s third through
sixth points.

V.  Best Interest Finding

In her first two points, Wytasha argues that
there was insufficient evidence to support the trial court=s
finding that termination of her parental rights was in her children=s best
interest.  TDFPS argues that there is
ample evidence to support the trial court=s
finding.  








A strong presumption exists that the best
interest of a child is served by keeping custody in the natural parent.  In re W.E.C., 110 S.W.3d 231, 240
(Tex. App.CFort Worth 2003, no pet.).  The fact finder may consider a number of
factors in determining the best interest of the child, including the
following:  (1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future; (3)
the emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley v. Adams,
544 S.W.2d 367, 371‑72 (Tex. 1976). 
Some listed factors may be inapplicable to some cases; other factors not
on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  

Regarding the first factor, the children did not
testify at trial, but the CPS and FBSS investigators and the CPS caseworker
testified that all four children are very bonded with their mother and love her
very much.  Wytasha testified that T.D.L.
expressed a desire to return to her care.  









Regarding the second factorCthe
children=s
present and future physical and emotional needsCCPS
caseworker Tarabishi testified that T.D.L., T.L., and Z.D.L. are doing well in
foster care.  T.L.C. is the only one of
the four children to have problems in foster care, and she is currently in her
third foster home. Tarabishi testified that T.L.C. has suffered depression and
hallucinations and has been hospitalized twice for behavior and for refusing to
take her medications.  She has been
physically abusive to other children in the foster home.  Wytasha testified that T.L.C. is used to
getting her way but that her behavioral problems have escalated since she was
placed in foster care.  Tarabishi
testified that she has no concerns about CPS=s
ability to find one home to adopt the three boys, but she is unsure if the
department will be able to find one home for all four children due to T.D.L.=s special
needs.  








Regarding the third factorCthe
present and future physical and emotional dangers to the childrenCTarabishi
testified that she is primarily concerned with Wytasha=s drug
use; she recommended termination of Wytasha=s
parental rights as in the children=s best
interest.  Additionally, the record shows
that when the children lived with Wytasha, there was little to no food in the
home on several occasions, that the electricity had once been shut off, and
that the house and children were dirty. 
There is evidence that Wytasha had not held a job during her involvement
with CPS and FBSS, and she had not yet found a job at the time of trial.  She applied at McDonald=s and a
Radisson hotel but did not get a job at either place.  Wytasha was allegedly living with friends and
family before she moved in with her new fiancé. 
She had not completed her service plan and had not taken the drug tests
requested by CPS.  Her fiancé has
transportation, and his house is on a bus route, but she does not have
transportation of her own.    

Regarding Wytasha=s
parenting abilitiesCthe fourth Holley factorCthe
record demonstrates that although Wytasha and her children love each other and
have a strong bond, Wytasha has failed to demonstrate adequate parental
abilities.  She took Xanax while pregnant
with her youngest child and continually misused prescription drugs.  CPS investigators found the home filthy,
without food, and once without electricity. 
A CPS investigator found Wytasha passed out while the children were in
the home without adult supervision. 
Wytasha left her children in Brenda=s care,
and Brenda passed out from prescription drug use while babysitting the
children. 








Concerning the fifth factor, although CPS
informed Wytasha of various programs that could assist her, including drug
treatment and parenting classes, as well as individual and family counseling
programs, Wytasha has failed to utilize any of these programs other than
attending a few parenting classes.   Regarding
CPS=s plans
for the childrenCthe sixth and seventh factorsCthe
department asked to be named managing conservator of the children and plans to
seek a home to adopt all four children. 
Currently, T.L. and Z.D.L. are together in one foster home, but the
other two children are in two different homes. 
None of the current foster homes are willing to adopt the children.  CPS is unaware of any other relatives with
whom the children could be placed, but the department plans to seek other
relatives interested in adopting the children.  


The record as outlined above provides evidence of
numerous acts or omissions of WytashaCthe
eighth factorCindicating that the existing
parent-child relationship is not in her four children=s best
interests.  Wytasha=s
continued misuse of prescription drugs and her failure to correct the problem
support the trial court=s finding that the best interest
of her children is better served by terminating her parental rights.  In her testimony, Wytasha placed great weight
on the fact that she is currently engaged and living with her fiancé because he
has a three-bedroom home and can provide them with transportation.  But the fact that she is now engagedCa fact
that she said nothing of to Tarabishi throughout her involvement with the caseCcannot
be the sole basis on which the trial court relies in deciding not to terminate
Wytasha=s
parental rights.








Finally, concerning the ninth factorCany
excuse for the parent=s acts or omissionsCWytasha
continuously blamed her failure to participate in the service plan or to attend
the weekly visits with her children on her lack of transportation, but even
after CPS offered to provide her with transportation and gave her a bus pass,
Wytasha failed to participate in the service plan.  Wytasha now claims that fiancé can provide transportation,
but during the four months that she lived with him, she did not set up or
attend any classes or counseling and continued to miss weekly visitations with
her children.  The trial court had no
obligation to accept this excuse as legitimate. 


Looking at all of the evidence in the light most
favorable to the best-interest finding, we hold that a reasonable trier of fact
could have formed a firm belief or conviction that its finding was true.  See J.F.C., 96 S.W.3d at 266; J.T.G.,
121 S.W.3d at 124‑25. 
Additionally, giving due consideration to evidence that the fact finder
could have found to be clear and convincing, and based on our review of the
entire record, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that the termination of Wytasha=s
parental rights would be in T.D.L., T.L.C., T.L., and Z.D.L.=s best
interest.  See W.E.C., 110 S.W.3d
at 247.  Accordingly, we hold that the
evidence is legally and factually sufficient to support the trial court=s
best-interest finding.  We overrule
Wytasha=s first
and second points.

 

 

 

V.  Conclusion








Having overruled Wytasha=s six
points, we affirm the trial court=s
judgment.

 

 

SUE WALKER

JUSTICE

 

PANEL B:   DAUPHINOT,
WALKER, and MCCOY, JJ.

 

DELIVERED: February 9, 2006











[1]See Tex. R. App. P. 47.4.





[2]The trial court also
terminated the parental rights of the alleged fathers of the four children, but
these four men are not parties to this appeal. 






[3]Before the Texas
Department of Family and Protective Services (TDFPS) filed this petition, the
trial court entered an order appointing S.E.H.=s paternal grandmother
Barbara managing conservator of S.E.H., and thus, S.E.H. was not subject to
this suit.  





[4]At trial, however,
Wytasha testified that the midwife Adidn=t authorize me [to take Xanax, but] . . . she
didn=t say I couldn=t take it.@   





[5]Harper later verified
that the school, in fact, would not provide transportation.  





[6]Brenda later verified to
Harper that she had moved in with Wytasha.





[7]Shallenberger told
Wytasha that it was important to follow through on her medications if they were
prescribed and that if she wanted to stop taking prescription medications, she
should talk to her doctor.    





[8]Wytasha also signed a
Release of Information in order for CPS to contact Dr. Vasped, but
Shallenberger testified that she never checked into whether he was Wytasha=s doctor or whether he
prescribed the drugs.  





[9]Shallenberger testified
at trial that she was uncomfortable closing the case due to Wytasha=s history and the fact
that Wytasha had not yet gone to her scheduled doctor=s appointment.  CPS referred the case to Family Preservation
Services (FPS), but FPS never re-opened the case.  





[10]Craddock and her
supervisor made this decision because the weather was cool enough for the
electricity to be off and because the children had just eaten fast food.  





[11]FBSS also asked Wytasha
to take a psychological evaluation, but FBSS, which normally sets up the
evaluation for the parent, failed to schedule one. FBSS enrolled Wytasha in a
drug treatment program (CATS) and a parenting program (ROADS).  Wytasha attended some ROADS classes but never
completed them, and she set up an appointment for a CATS class but never
attended one. 

 





[12]Wytasha testified at
trial that sickle cell anemia makes it difficult for her to walk long distances
and that she could pass out if she stayed in the heat for a long period of
time.   





[13]The fourth referral dealt
with the grandmother=s prescription drug
misuse while babysitting the children.